Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

ATTORNEY FOR APPELLANT (MOTHER):

**MARIANNE WOOLBERT**
Anderson, Indiana

ATTORNEY FOR APPELLANT (FATHER):

**WESLEY D. SCHROCK**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**CHRISTINE REDELMAN**
Deputy Attorney Generals
Indianapolis, Indiana

**FILED**

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) ) | |
| A.C. (MINOR CHILD) AND E.C. (MOTHER) AND R.C. (FATHER) | ) ) ) ) ) | |
| Appellant-Respondent, | ) ) | No. 48A02-1310-JT-875 |
| vs. | ) ) ) | |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE CIRCUIT COURT OF MADISON COUNTY
The Honorable G. George Pancol, Judge
Cause No. 48C02-1305-JT-16

**May 28, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

MATHIAS, Judge

E.C. ("Mother") and R.C. ("Father") (collectively, "Parents") appeal the involuntary termination of their parental rights to their child, A.C. Mother and Father challenge the sufficiency of the evidence supporting the trial court's judgment.

We affirm.

## Facts and Procedural History

Mother and Father are the biological parents of A.C., who was born on June 5, 2010. On December 27, 2011, when A.C. was one and a half years old, the Department of Child Services ("DCS") received a report that Father was incarcerated[1] and Mother, who was caring for A.C. alone, had recently suffered a nervous breakdown requiring hospitalization.[2] The report also stated that Mother had attempted suicide by drinking household cleaning liquids in July 2011 and again in November 2011 and suffered from mental health problems and drug abuse.

On December 28, 2011, DCS Family Case Manager Russell Beatty ("FCM Beatty") visited Mother's home. Mother admitted to FCM Beatty that she had attempted suicide twice that year and had suffered a nervous breakdown. Mother showed her prescription medication to FCM Beatty and told him that she had been diagnosed with PTSD, anxiety, ADHD, panic attacks, lumbar/back pain, and possibly bi-polar disorder. Mother also told FCM Beatty that Mother's parental rights had been involuntarily

---

[1] Father was incarcerated on a probation violation for a diluted drug screen. Father's probation was part of his sentence for a 2006 conviction for domestic violence committed against his ex-wife.

[2] Mother and two of her older children were victims of a house fire on December 19, 2003. On December 18, 2011, police found Mother lying on the ground in the middle of a public street, screaming. Mother's hospitalization was apparently prompted by the impending arrival of the anniversary of the 2003 house fire, as well as Father's recent incarceration.

terminated with regard to her other four children.[3] FCM Beatty observed A.C. to be "happy, healthy, and content." Appellant Father's App. p. 3. FCM Beatty also visited Father in jail. Father told FCM Beatty that he was concerned for the safety of A.C. in Mother's care.

Two days later, on December 30, 2011, DCS detained A.C. on an emergency basis and placed her with her paternal grandparents ("Grandparents"). On January 3, 2012, after the trial court's authorization, DCS filed its affidavit of probable cause for A.C.'s detention and a verified petition alleging A.C. is a Child in Need of Services ("CHINS"). The petition alleged that Mother had twice attempted suicide in 2011, that Mother reported that she had suffered a nervous breakdown in December 2011, that Mother reported various mental and physical health problems, that Mother's parental rights to four other children had already been terminated, that Father was incarcerated on a probation violation, that Father was on probation due to his conviction for domestic violence against his ex-wife, and that Father was concerned for A.C.'s safety while she was in Mother's care. The trial court held a detention hearing on January 4, 2012. Parents appeared at the hearing, were found to be indigent, and were appointed counsel. Parents admitted the allegations in the CHINS petition and A.C. was adjudicated a CHINS.

---

[3] Mother entered into a program of Informal Adjustment due to allegations of medical neglect and hygiene issues with four of her other children and her home in 2006. In December 2006, DCS detained the four children after Mother was arrested for Neglect of Dependents for Operating a Motor Vehicle while intoxicated and leaving the scene of an accident. The children were adjudicated as CHINS in December 2006. As ordered by the trial court, Mother completed a substance abuse program but relapsed. She neither completed a psychological evaluation nor secured suitable housing or stable employment and was arrested several times while the case was pending. She also failed to visit her children for more than a year. Her parental rights were terminated to those four children on May 29, 2009.

On February 8, 2012, the trial court held a dispositional hearing. At the hearing, the court approved DCS's permanency plan of reunification, removed A.C. from Parents' care, and maintained A.C.'s placement with Grandparents. The court also ordered Parents to: (1) participate in counseling; (2) complete a drug and alcohol assessment and follow all of the recommendations of that assessment; (3) complete a psychological evaluation and follow the recommendations of that evaluation; (4) obtain and maintain a legal and regular source of income; (5) visit with A.C. regularly; (6) abstain from illegal drug use; (7) submit to random drug screens; and (8) obey the law.

Pursuant to the court's order, Mother received substance abuse treatment at Aspire Indiana ("Aspire"), a local mental health center, from April to August 2012. However, during and after her participation in the therapy program, she tested positive on four of ten random drug screens for medications for which she had no prescription, including oxycodone, oxymorphone, hydrocodone, and Xanax. Mother also participated in a cognitive-behavioral group therapy program at Aspire beginning in March 2012, but she missed most of her appointments and sometimes failed to take her prescribed medication. Her prognosis for this therapy program was guarded and poor. Eventually, she was discharged from Aspire due to her withdrawal from services.[4]

Father completed substance abuse and mental health evaluations at Aspire. In August 2012, he also completed a substance abuse and mental health group therapy program at Aspire, although he regularly failed to test positive for his prescribed mental

---

[4] Both Mother and Father stopped participating in services at Aspire after DCS filed its petition to terminate parental rights.

4

health medications and although, while he was in the program, he had a positive drug screen for unprescribed hydrocodone, temazepam, oxycodone, and oxymorphone and Xanax. In September 2012, after Father completed that group therapy program, he began participating in an anxiety and depression group therapy program. He was discharged unsuccessfully after he stopped attending in April 2013.

On July 11, 2012, the trial court held a review hearing. At the hearing, the court found that Parents had not "enhanced their ability to fulfill their parental obligations," "participated in services consistently," or "maintained contact with DCS." DCS Exhibit 13. Some six months later, on January 2, 2013, the trial court held a permanency hearing. At the hearing, the court approved DCS's permanency plan, which was still, at this point, A.C.'s reunification with Parents.

During the six month period between July, 2012, and January, 2013, Parents were permitted supervised visits with A.C. at Grandparents' home. However, Parents visited A.C. inconsistently. In November 2012, the supervised visits were moved to Aspire's offices. Parents began visiting there with A.C. consistently but were at least twenty minutes late to nearly every visit. Beginning in the winter of 2012-2013, Parents were permitted to visit with A.C. in their own home, but those visits were often cut short when, usually without any apparent provocation, Mother would begin to act inappropriately and childishly in front of A.C., screaming, crying, throwing objects, and crawling under furniture. Approximately a month after the home visits began, FCM Weir discovered a "very thick furry mold" covering the walls in several rooms of Parents' home. Thereafter, Parents' visits with A.C. returned to Aspire offices, where Parents missed

5

many of their scheduled visits. The visits ended in April 2013, after a visit supervisor determined that Mother's agitation and outbursts during the visits upset and endangered A.C. Parents were permitted to visit A.C. at Grandparents' home, but Parents' only visit with A.C. after the Aspire supervised visits ended was on A.C.'s birthday.

On May 16, 2013, DCS filed a motion to modify the February 2012 dispositional order and, two weeks later, on May 31, 2013, filed a petition for involuntary termination of parental rights. After a June 26, 2013 hearing on DCS's motion to modify the dispositional order, the trial court granted DCS's motion, finding that, since entry of the dispositional decree, Parents have "continue[d] to have substance abuse problems," had to end visits early due to Mother's behavior, had stopped visiting A.C. altogether, and had "been very evasive with DCS," moving several times and not reporting their change of address to DCS. The order stated that reunification services would no longer be provided for Parents.

On September 3, 2013, the trial court held a hearing on DCS's petition to terminate parental rights. On the date of this hearing, both Mother and Father were unemployed with no stable source of income, were separated, and both were without a home of his or her own. Mother was living with her former landlord, and Father was living with his daughter and granddaughter. At the hearing, FCM Weir testified that Parents "never reached the point that it was safe [to visit with A.C.] unsupervised." Tr. p. 19. She stated that there were no overnight visits between A.C. and Parents because "it just wasn't a safe situation . . . with [Mother's] mental health issues and her behavior." Id. She stated that A.C. is "doing very well" in Grandparents' care. She testified that the

circumstances which prompted A.C.'s removal from Parents' home have not been alleviated "at all." Id. at 20. She opined that continuation of the parental relationship was a threat to A.C.'s well-being because "she sees you know mom screaming and car[ry]ing on and then [A.C.] becomes upset and [A.C. has] made the statement in visits several times that mom's sick and she [gets] upset when mommy gets like that." Id.

Court appointed special advocate Kelsey Antrim ("CASA Antrim"), was appointed by the trial court on August 1, 2013, and after reviewing all of the court reports from A.C.'s CHINS case, testified that her recommendation was that parental rights be terminated. CASA Antrim stated, "I think it's important for especially as young as she is to have that stability and permanency in her life." Tr. p. 85.

Following the hearing on DCS's petition to terminate parental rights, the trial court issued an order terminating Parents' parental rights. The court's findings of fact provided, in relevant part:

> 10. Father received substance abuse group therapy at Aspire, but had positive drug screens after completion of his recommended therapy.
>
> 11. Mother received substance abuse group therapy at Aspire, but had positive drug screens before and after completion of her recommended therapy.
>
> 12. DCS administered ten (10) random drug screens to Father. He tested positive on five (5) of them for medications for which he had no valid prescription, including hydrocodone, temazepam, oxycodone, and oxymorphone.
>
> 13. DCS administered ten (10) random drug screens to Mother. She tested positive on four (4) of them for medications for which she had no valid prescription, including oxycodone, oxymorphone, hydrocodone, and Xanax.

7

14. Father made only moderate progress during his depression/anxiety group therapy at Aspire. He attended roughly half of his scheduled meetings, and his prognosis was guarded. However, once DCS filed its petition to terminate parental rights, Father failed to return to Aspire and was discharged due to his withdrawal from services.

15. Mother made no progress in her dialectical behavior group therapy at Aspire. She attempted to engage in the recommended therapy on three separate occasions, but was unsuccessful each time. She missed most appointments, was occasionally medication noncompliant, and her prognosis was guarded and poor. Eventually, Mother failed to return to Aspire and was discharged due to her withdrawal from services.

16. On three occasions, a supervised visit had to be stopped due to Mother's agitation and vocal outbursts upsetting the Child. Once DCS filed its petition to terminate parental rights, Mother failed to return to Aspire and she was discharged due to her withdrawal from services.

17. On the date of final hearing, Parents were still able to have supervised visitation with Child in the pre-adoptive home, but Parents maintained only minimal contact with Child.

18. On June 5, 2012, Mother plead[ed] guilty to public intoxication and was sentenced to 363 days probation.

19. On August 6, 2013, Mother plead[ed] not guilty to operating while intoxicated, her license was suspended, and her case was set for trial.

20. Mother's parental rights were terminated to four (4) prior children in 2009.

21. Parents have never had an overnight visit or a trial home visit with Child due to a general lack of stability.

22. On the date of final hearing, Parents were unemployed and had no stable source of income with which to support and maintain Child.

Appellant Father's App. pp. 22-25.

The trial court made the following conclusions of law:

Based on the foregoing and pursuant to Indiana Code § 31-35-2-4(b)(2), the Court determines that the child, [A.C.], has been removed from the care and

custody of her Parents, [] for more than six (6) months under a dispositional decree. The Court also finds that there is a reasonable probability that the conditions that resulted in Child's removal from Parents, and the reasons for placement outside the home, will not be remedied as Parents did not successfully complete the positional orders issued by this Court. At this time, Parents are not in a position to provide the care that Child requires. Child has been in relative care since December 30, 2011—more than twenty (20) months—and Parents are not any closer to having Child return to their care than when Child was first removed. As such, this Court finds that the continuation of the parent-child relationship poses a threat to the well-being of Child. Specifically, Parents have failed to demonstrate that they are ready, willing, and able to care for Child. The Indiana Department of Child Services has never been in a position to recommend that Child be reunified with Parents. Termination is in the best interest of Child. Finally, the Indiana Department of Child Services has a satisfactory plan for Child, which is adoption.

Appellant Father's App. p. 28.

Mother and Father now appeal.[5]

## Standard of Review

On appeal, Mother and Father both argue that DCS failed to prove by clear and convincing evidence that the conditions that resulted in A.C.'s removal would not be remedied, that continuation of the parent-child relationship poses a threat to A.C., or that termination of parental rights is in A.C.'s best interests. Father also challenges the trial court's findings of facts.

We begin our review by acknowledging that when reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider

---

[5] Mother and Father filed separate appellate briefs. We admonish Father's appellate counsel that counsel's deliberate ommission of certain facts important to our analysis fails to comply with Indiana Appellate Rule 46(A)(6)(b), which requires that appellate briefs provide a narrative and fair statement of the facts in a light most favorable to the judgment.

9

only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

Here, in terminating Mother's and Father's parental rights, the trial court entered specific factual findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. L.S., 717 N.E.2d at 208.

**Discussion and Decision**

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. In re K.S., 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child,

10

parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

"The State's burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). If the trial court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

Initially, we observe that Indiana Code section 31-35-2-4(b)(2)(B) requires a trial court to find that only one of the three elements of subsection (b)(2)(B) has been established by clear and convincing evidence before properly terminating parental rights. See L.S., 717 N.E.2d at 209. Because we find them to be dispositive, we limit our review to Father's challenge of the court's findings of fact and to Parents' allegations of error pertaining to subsections (b)(2)(B)(i) and (b)(2)(B)(ii) of Indiana's termination statute,

11

namely, whether DCS proved by clear and convincing evidence that there is a reasonable probability that (1) the conditions that resulted in the child's removal will not be remedied and (2) the continuation of the parent-child relationship poses a threat to the well-being of the child.

## I. Findings of Fact

Father challenges the trial court's findings that Father's progress in therapy is "moderate" and his prognosis is "guarded," arguing (1) that Aspire employees who testified at the termination hearing stated that he completed his services and (2) that those witnesses did not use the words "moderate" or "guarded." However, Father's argument amounts to a request that we reweigh the evidence, which we cannot do. See In re D.D., 804 N.E.2d at 365. Father ignores the fact that the trial court also considered documentation submitted by Aspire which indicated that Father attended approximately half of his scheduled depression and anxiety group therapy sessions and was ultimately discharged unsuccessfully from the program with a prognosis of guarded. Furthermore, the evidence shows that, once DCS filed its petition to terminate parental rights, Father abandoned the services altogether. Because the record contains facts that support the challenged findings, we conclude that Father has not shown that these findings are clearly erroneous.

## II. Conditions Remedied

Mother and Father argue that the trial court clearly erred in concluding that the conditions justifying A.C.'s removal are not likely to be remedied. When determining whether a reasonable probability exists that the conditions justifying a child's removal

and continued placement outside the home will not be remedied, the trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. In so doing, the trial court may consider the parent's response to the services offered through the Department of Child Services. Lang v. Starke County Office of Family and Children, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), trans. denied. Additionally, DCS is not required to rule out all possibilities of change; rather, it need establish "only that there is a reasonable probability that the parent's behavior will not change." In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Mother argues that her own behavior does not indicate that "she is unwilling to cooperate with [DCS]" and, therefore, the trial court improperly terminated her parental rights. Appellant Mother's Br. at 13. She attempts to excuse her lack of compliance with the ordered reunification services by contending, "At the time of the termination hearing Mother did not complete all services due to the fact DCS had stopped paying for them and she did not have the money to pay herself to continue." Id. She maintains that she "want[s] to get her life straightened out," and emphasizes that she obtained counseling on her own after DCS stopped paying for the services and that she completed a substance abuse evaluation at Aspire. Id. at 15. Finally, she argues:

> Mother was not given sufficient opportunity to heal from her trauma. She was held to the same standard for completion of services as people who had not been through what she had that deeply affected her. She was treated as if there were no serious issues she had survived and that she should respond as a typical person who had not been through what she had would.

13

Id.

Father argues that DCS failed to prove by clear and convincing evidence that conditions that resulted in A.C.'s removal would not be remedied because there was "no evidence at trial that Father had disobeyed the law," he "completed his [substance abuse] group therapy," he "never missed a visit" with A.C., he "followed the recommendations" of the drug and alcohol assessment by Aspire; he completed a psychological evaluation, submitted to random drug screens, and because "there was never any testimony from any witness suggesting that Father used illegal drugs." Appellant Father's Br. at 12-13. Father admits that he has not obtained or maintained a regular source of income but argues that his "failure to comply with this one item is not enough upon which the Court could base its conclusion." Id. at 14.

The record demonstrates that neither Mother nor Father completed a psycho-parenting evaluation and only participated in home-based therapy services for about a month. Both Mother and Father were unemployed, with no source of income or home of their own. After A.C. was removed from Parents' home, Parents visited A.C. inconsistently, were often late, and eventually stopped visiting A.C. altogether. Both Mother and Father have criminal histories,[6] and Mother's parental rights were terminated with regard to her four other children, even after she was offered services for three years.

---

[6] On June 5, 2012, Mother pleaded guilty to public intoxication. She was sentenced to 178 days, suspended to 363 days of probation. On August 13, 2013, Mother pleaded not guilty to Class A misdemeanor and Class C misdemeanor operating while intoxicated and Class A misdemeanor driving while suspended. Mother's license was suspended and her case was scheduled to be tried in October 2013.

FCM Weir testified that Mother and Father have moved frequently in an attempt to evade DCS. FCM Weir also testified that Mother and Father never exercised any unsupervised visits with A.C. because they "never reached the point that it was safe [A.C.]," and that the reasons that prompted A.C.'s removal were "not at all" alleviated. Tr. pp. 19-20.

The trial court made numerous and detailed findings indicating that both Mother and Father have a history of serious substance abuse and mental health problems. Both Parents failed to complete their behavior therapy programs. Even after receiving substance abuse counseling, Mother and Father tested positive for unprescribed medication and failed to test positive for prescribed mental health medication. Despite the extensive services offered to them since A.C. was removed, including substance abuse treatment, mental health treatment, counseling, and supervised visitation, Parents were not able to remedy the circumstances which led to A.C.'s removal, to the degree that even an unsupervised visit with A.C. would have been unsafe. Therefore, Parents failed to adequately demonstrate that the trial court erred in concluding that there is a reasonable probability that the conditions necessitating A.C.'s removal will be remedied. See In re B.D.J., 728 N.E.2d 195 (Ind. Ct. App. 2000) (affirming trial court's determination that there was a reasonable likelihood that conditions which led to placement of children who had been removed from their mother's home in foster care, rather than with their father, would not be remedied, so that termination of father's parental relationship was warranted; father had not provided housing or support for his children, at time of termination hearing had not obtained facilities to house his children, had failed to appear for numerous hearings, had not sought any services, and had visited

15

children only three times); see also Lang, 861 N.E.2d at 372 ("[A] pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support[s] a finding that there exists no reasonable probability that the conditions will change.")

Although we recognize that Father and Mother did participate in some services, simply going through the motions of receiving services alone is not sufficient if the services do not result in the needed change, or only result in temporary change. "Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonabl[y] find that under the circumstances, the problematic situation will not improve." In re A.H., 832 N.E.2d 563, 570 (Ind. Ct. App. 2005).

Under these facts and circumstances, we conclude that DCS presented ample evidence to support the trial court's determination that there is a reasonable probability the conditions resulting in A.C.'s removal from Father's and Mother's care will not be remedied. The parents' arguments to the contrary amount to an invitation to reweigh the evidence, which we may not do. See Bester, 839 N.E.2d at 149 (stating that trial court is vested with responsibility of resolving conflicting testimony and an appellate court may not reweigh the evidence or judge witness credibility).

### III. Threat to Child's Well-Being

Termination of parental rights is proper where the child's emotional and physical development is threatened. In re T.F., 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), trans. denied. The court need not wait until a child is harmed irreversibly such that her physical, mental, and social development is permanently impaired. Id.

16

A trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N .E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied.

Here, the record shows that Mother has a history of serious mental health issues and has repeatedly behaved inappropriately in front of A.C., causing A.C. to become upset. The record also indicates that Mother and Father have failed to take initiative to address their mental health problems by taking their prescribed medications or completing mental health treatment programs. Furthermore, positive drug screens indicate that Mother and Father have failed to address their substance abuse problems, despite having received counseling. Both Mother and Father are unemployed, with no housing of their own.

Parents' arguments here amount to a request that we reweigh the evidence, which we will not do. Thus, based on the record, we are satisfied that the facts support the trial court's conclusion that continuation of the parent-child relationship poses a threat to A.C.'s well-being.

## IV. Best Interests of Child

Finally, both Mother and Father argue that the trial court's conclusion that termination was in A.C.'s best interest was clearly erroneous. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. In re J.C., 994 N.E.2d 2778 (Ind. Ct. App. 2013). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." Castro v. State Office of Family & Children, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), trans. denied. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." In re A.K., 924 N.E.2d 212, 224 (Ind. Ct. App. 2010).

We have already noted both Parents' financial and housing instability, failure to successfully complete a majority of the court-ordered reunification services, and unresolved substance abuse and mental health issues. Furthermore, both FCM Weir and CASA Antrim testified that terminating the parent-child relationship would be in A.C.'s best interest. Based on the totality of the evidence, we conclude that there is sufficient evidence to support the trial court's findings and ultimate determination that termination of Father's and Mother's parental rights is in A.C.'s best interests. See In re B.J., 879 N.E.2d 7 (Ind. Ct. App. 2008) (affirming trial court's conclusion that termination of mother's parental rights was in the children's best interests; evidence showed that, at the

18

time of the termination hearing, mother had not completed court-ordered services, which included intensive outpatient program for her substance abuse problem and mental health treatment for her depression, and children were progressing well in their new home); see also In re Termination of Parent-Child Relationship of D.D., 804 N.E.2d 258 (Ind. Ct. App. 2004) (evidence supported conclusion that termination of mother's parental rights was in child's best interests; evidence demonstrated that mother had history of substance abuse and mental health problems; despite extensive services offered to mother, including substance abuse treatment, psychiatric evaluations, psychiatric care, medications, counseling, housing, and financial assistance, mother failed to adequately demonstrate a change in the conditions that necessitated child's continued removal, and, during therapeutic visitations between child and mother, child's counselor had concerns that mother placed child in an adult role and made inappropriate comments in front of child).

**Conclusion**

The specific findings set forth above clearly and convincingly support the trial court's determination that there is a reasonable probability that the conditions leading to A.C.'s removal will not be remedied and that continuation of the parent-child relationship poses a threat to A.C.'s well-being. These conclusions, in turn, support the trial court's ultimate decision to terminate Mother's and Father's parental rights to A.C. For all of these reasons, we find no error in the trial court's termination of Mother's and Father's parental rights.

Affirmed.

FRIEDLANDER, J., and PYLE, J., concur.